# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

MENZIES AVIATION (USA), INC.,

        Plaintiff,


v.                                    **MEMORANDUM OF LAW**
        Civil File No. 13-2702 (MJD/JJK)


ROBERT WILCOX, SERVISAIR, LLC,
and DOES 1-10,

        Defendants.

---

Christopher G. Ward and Lisa M.  Noller, Foley & Lardner LLP, and Corey J. Ayling, McGrann Shea Carnival Straughn & Lamb, Chtd., Counsel for Plaintiff Menzies Aviation (USA), Inc.

Burt T. Osborne and William M. Cunningham, Counsel for Defendant Robert Wilcox.

Dane B. Jaques, McKenna Long & Aldridge, LLP, and Andrew L. Marshall, Bassford Remele, PA, Counsel for Defendant Servisair, LLC.

---

## I.      INTRODUCTION

This matter is before the Court on Plaintiff's Motion for a Temporary Restraining Order.  [Docket No. 6]  The Court heard oral argument on October 17, 2013.  The Court denied the motion in an October 17 Order [Docket No. 40]

with a memorandum of law to follow.  Accordingly, the Court hereby enters the

following Memorandum of Law.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    The Parties

Plaintiff Menzies Aviation (USA), Inc. ("Menzies") is a non-airline-owned

aviation support company providing aviation ground handling services, such as

air cargo, baggage, passenger, and ramp handling services, at multiple airports.

(Verified Complaint ("Compl.") ¶ 8.)  Menzies provides ground handling

services to multiple commercial aviation carriers at the Minneapolis-St. Paul

International Airport ("MSP").  (Id.)

From 2006 until 2012, Menzies had only one customer at MSP, Sun

Country Airlines ("Sun Country").  (Wilcox Aff. ¶ 16.)  In 2012, Menzies added

Spirit Airlines as its second customer.  (Id.)  Mid-2013, Menzies added Frontier

Airlines as a customer.  (Id. ¶ 17.)  However, Sun Country remained, by far,

Menzies' largest customer at MSP.  (Id. ¶ 18.)

In 2005, Defendant Robert Wilcox was hired as the General Manager of

Ground Handling Services with Integrated Airline Services Alliance LLC

("IASA") at MSP.  (Wilcox Aff. ¶ 2.)  Wilcox has worked in the airline ground

handling industry since 1985.  (Id. ¶ 3.)

In 2006, Menzies acquired IASA.  ([Docket No. 21] Ex. A.)  According to

Wilcox, he continued to perform the same job but with Menzies, rather than

IASA, as his employer.  (Wilcox Aff. ¶ 5.)  According to Menzies, in September

2006, Menzies hired Wilcox as its General Manager at MSP.  (Harnden Aff. ¶ 2;

Compl. ¶ 13.)  He was Menzies' highest ranking employee at MSP.  (Compl. ¶

13.)

Defendant Servisair, LLC ("Servisair") is an international provider of

aviation ground services, with 119 stations in 20 countries.  (R. Ward Decl. ¶ 2;

Arble Decl. ¶ 2.)  Servisair has conducted operations at MSP since 2005.  (Arble

Decl. ¶ 3.)  Servisair and its predecessors have provided services to Sun Country

for more than 20 years.  (R. Ward Decl. ¶ 4.)  Servisair currently provides ground

handling services to Sun Country at the Las Vegas, Miami, and Los Angeles

airports.  (Id.)

## 2. The Non-Compete

A few days after Wilcox began working for Menzies, he was given a large

stack of documents and told to sign and return them immediately; he did so.

3

(Wilcox Aff. ¶ 6.)  Included in the stack was a Confidentiality, Non-Competition

and Non-Solicitation Agreement ("Non-Compete") with Menzies dated

September 13, 2006.  (Compl., Ex. A.)  Wilcox signed the document, but Menzies

did not.  (Id.)  The Non-Compete provides:

> In consideration of the employment of [Wilcox] and the
> salary and other remuneration and benefits paid by the Company to
> [Wilcox] while [he] is employed by the Company, and other good
> and valuable consideration …
>
> [Wilcox] agrees . . . that [he] will not, during the course of [his]
> employment by the Company and for ten (10) years after the
> cessation of employment, directly or indirectly use, disclose or
> disseminate to any other person, organization or entity or otherwise
> employ any Trade Secrets.  [Wilcox] further agrees, except as
> specifically required in the performance of [his] duties for the
> Company, that [he] will not, during the course of [his] employment
> by the Company and for two (2) years after the cessation of that
> employment, disclose or disseminate to any other person,
> organization or entity or otherwise employ any Confidential
> Information.  The obligations set forth herein shall not apply to any
> Trade Secrets or Confidential Information which shall have become
> generally known to competitors of the Company through no act or
> omission of the Employee.

(Non-Compete ¶ 3.)

The contract also provides:

> The Employee agrees that during [his] employment with the
> Company and for twelve (12) months after the cessation of [his]
> employment with the Company, [Wilcox] shall not, directly or
> indirectly, on behalf of [himself] or any person or entity other than

4

the Company, engage in the provision of airport services, including cargo hauling, or the management of such services, at any airport where [he] worked during the last two (2) years of [his] employment with the Company.

(Non-Compete ¶ 6(c).)

Also,

The Employee agrees that for twelve (12) months after the cessation of [Wilcox's] employment [he] will not directly or indirectly solicit or attempt to solicit any customer, former customer or prospective customer of the Company for the purpose of providing airport services, including cargo hauling.  This restriction shall apply only to any customer, former customer or prospective customer of the Company with whom [Wilcox] had contact during the last two (2) years of [his] employment with the Company.

(Non-Compete ¶ 7(b).)

The contract states that it "is to be governed by and construed under Florida law, without regard to its provisions concerning choice of laws."  (Non-Compete ¶ 17.)

Wilcox asserts that no one at Menzies ever explained the terms, meaning, or significance of the Non-Compete to him.  (Wilcox Aff. ¶¶ 6-7.)  He further asserts that the Non-Compete did not provide him with any employment benefits; he remained an at-will employee as he had been before he signed the agreement.  (Id. ¶ 5.)  Throughout Wilcox's term of employment with Menzies,

5

Menzies never changed or increased his responsibilities, promoted him, or

provided him with any specialized job training.  (Id. ¶ 9.)

### 3.    Wilcox's Email

Wilcox used a Menzies laptop computer at work.  (Wilcox Aff. ¶10.)

Menzies required Wilcox to be available at all times to address work issues and

expected that he would work from home as needed.  (Id. ¶ 11.)  Wilcox avers that

he was unable to access his office laptop from his home.  (Id. ¶12.)  Therefore, as

a matter of routine, he would email documents from his work laptop to his

personal computer so that he could perform work-related duties at home.  (Id.;

(Compl. ¶ 30 (alleging that, as early as February 2011, Wilcox sent dozens of

emails containing Menzies-generated material to his personal email addresses).)

Sun Country routinely sent emails to his personal email address regarding

business matters.  (Wilcox Aff. ¶ 12.)  According to Menzies, some of the emails

that Wilcox emailed to himself included attachments with Menzies' customer

contracts, financial information, and operational planning documents.  (Compl. ¶

31.)

Menzies was aware that Wilcox sent work emails to his personal computer and, Menzies, itself, sent work emails to Wilcox's personal email address. (Wilcox Aff. ¶ 13; Wilcox Aff., Exs. I, III.)

When Wilcox had completed a particular task, he would normally delete the information from his personal computer because he no longer needed it. (Wilcox Aff. ¶ 15.)  Wilcox avers that no Menzies employment policy prohibited him from emailing himself work documents to enable him to work at home, and no manager told him not to do so.  (Id. ¶ 14.)  There was no policy telling Wilcox which information was supposed to be treated as a trade secret or confidential. (Id.)

### 4.    Sun Country's Decision to Change Ground Handlers and Wilcox's Relationship with Servisair

During 2012 and 2013, Sun Country repeatedly told Wilcox and other Menzies employees that Menzies was not meeting Sun Country's expectations in terms of equipment, labor, and safety.  (Wilcox Aff. ¶ 19.)  Spirit Airlines also complained to Wilcox about substandard service by Menzies.  (Id. ¶ 20.)  Wilcox repeatedly told both his manager, Kevin Brown, and Brown's manager, John Redmond, about Sun Country's continuing displeasure and tried to remedy the

issues. (Id. ¶ 21.)  Wilcox often served as a mediator between Menzies and Sun

Country personnel who were complaining to him about Menzies.  (Id. ¶¶ 22-23.)

Wilcox was very concerned about Sun Country's dissatisfaction because

Redmond had repeatedly told Wilcox that if Menzies lost Sun Country's

business, Wilcox would lose his job with Menzies.  (Wilcox Aff. ¶ 24.)

During the end of March 2013, Wilcox forwarded internal emails from his

Menzies supervisors expressing concerns about his job performance to

representatives of Menzies' MSP customers.  (See, e.g., Harnden Aff. ¶ 7A;

Harnden Aff., Ex. 1.)

In March 2013, Wilcox told Redmond that he was frustrated over Menzies'

failure to deal with Sun Country's complaints about labor, equipment, and safety

issues.  (Wilcox Aff. ¶ 26.)  Redmond acknowledged that Sun Country was

dissatisfied and told Wilcox to go work for Servisair or some other "mom &

pop." (Id. ¶ 27.)

On April 4, Jerry Fuller, Senior Director of Ground Operations for Sun

Country, told Robin Ward, Vice President of Business Development for Servisair,

that Sun Country was not satisfied with the ground handling services being

provided by Menzies.  (R. Ward Aff. ¶ 5.)  Fuller stated that Sun Country wanted

a proposal from Servisair for MSP ground handling.  (Id.)

In April 2013, Servisair contacted Wilcox and asked if he would be

interested in looking at a position with Servisair.  (Wilcox Aff ¶ 45.)  On April 19,

Wilcox sent his resume to Servisair.  (C. Ward Aff. ¶ 4A; C. Ward Aff., Ex. 2.)

In May, Menzies' Kevin Brown made an offer to Sun Country to extend the

contract, but advised Sun Country that the new contract would involve a rate

increase.  (Fuller Aff. ¶ 6.)  Fuller told Menzies that, if Menzies intended to

increase the rate, Sun Country was soliciting Requests for Proposal ("RFPs")

from other handlers.  (Id.)

Servisair's Ward was the sole negotiator on behalf of Servisair for Sun

Country's business; Ward did not have any interaction with Wilcox until after

the agreement with Sun Country at MSP was signed.  (R. Ward Decl. ¶¶ 8-9.)  No

one ever informed Ward of the substantive terms of any bid submitted by

Menzies for ground handling services such as financial terms or rates charged.

(Id. ¶ 10.)  Servisair avers that Wilcox did not share any confidential or

proprietary information with Servisair, and that Servisair did not use any such

information in obtaining the Sun Country contract.  (R. Ward Decl. ¶¶ 9-10;

Arble Decl. at ¶ 4; Perry Decl. ¶¶ 10-11.)

On June 6, 2013, Servisair interviewed Wilcox, in Houston, for the position

of MSP General Manager with Servisair.  (Perry Aff. ¶ 2.)  At that time, the

position only involved fueling operations at MSP.  (Id.)  Servisair did not hire

Wilcox for that position.  (Id. ¶ 5.)

On July 18, Fuller told Menzies that Sun Country had substantial concerns

with Menzies' proposal.  (Fuller Aff. ¶ 8; Fuller Aff., Ex. B.)

On July 25, Wilcox emailed himself Menzies information, including MSP

staffing and scheduling formulas and practices for providing service to Sun

Country at MSP.  (Harnden Aff. ¶ 7B; Harnden Aff., Ex. 4.)

On August 5, Fuller sent written notice to Menzies that its contract with

Sun Country would be terminated effective November 5, 2013.  (Fuller Aff. ¶ 4;

Fuller Aff., Ex. A.)  Sun Country informed Menzies that Servisair would be

taking over and asked that Menzies work with Servisair for a smooth transition.

(Fuller Aff., Ex. A.)

On August 6, Sun Country's Fuller emailed Wilcox, copying Brown,

notifying Wilcox and Brown of the termination of the Menzies contract.  (Wilcox

Aff. ¶ 28.)  Brown then told Wilcox that his job with Menzies would end on

November 5, 2013, that Menzies would transfer its business to another company

on that date, and that Wilcox would be free to apply for a job with the new

company without preference for any prior Menzies service.  (Id. ¶ 29.)  Wilcox

avers that, after this conversation, he approached Servisair for possible

employment.  (Id. ¶ 30; see also Perry Decl. ¶ 6.)

On August 6 and 7, Servisair and Wilcox emailed to begin negotiations for

him to run its MSP ground handling operation.  (C. Ward Aff. ¶ 4C; C. Ward

Aff., Ex. 5.)  In an email to Servisair, Wilcox stated that he would be busy

working on getting Menzies' Frontier Airlines handling service started and

moving Menzies to new offices, but that he would like to move quickly over to

Servisair while still giving Menzies' 30 days' notice so it had time to replace him.

(Id.)  Servisair responded and told Wilcox that "this could be a delicate

situation."  (Id.)

On August 12, Wilcox emailed himself 49 attachments with files and

copies of Menzies' communications and information related to Menzies'

provision of service to Sun Country at MSP.  (Harnden Aff. ¶ 7C; Harnden Aff.,

Ex. 6.)  (The exhibit provided does not include the actual attachments.)

On August 12, John Redmond, Menzies Senior Vice President Americas, emailed Wilcox and Brown and stated, in part:

> It's a very bad day for Menzies Aviation, and none of us (and for the avoidance of doubt I include myself and yourself in this) have covered ourselves in glory in the way we have lost this business – the loss was avoidable had we listened more attentively to the customer – from my recent conversations with Jerry and my 1 conversation with John Fredericksen [President and CEO of Sun Country] that was made very clear.

> But it has gone, and now we have to plan for life without Sun Country but with Spirit & Frontier, and we have to learn from all of the mistakes that we have all made in the past.

(Marshall Decl., Ex. A.)

On August 14, Sun Country and Servisair executed the ground handling agreement with Servisair, effective November 7, 2013.  (R. Ward Decl. ¶¶ 6-7.) Sun Country avers that Wilcox was not involved in any of Sun Country's bidding negotiations with Menzies; nor was he a factor in its decision to terminate Menzies or enter an agreement with Servisair.  (Fuller Aff. ¶ 10.)  Sun Country further avers that its reasons for terminating the Menzies' contract involved labor, equipment, and safety issues that Sun Country had with Menzies' performance.  (Id. ¶ 5.)

On August 20 and 21, Wilcox and Servisair corresponded regarding his job offer from Servisair and compensation negotiations.  (C. Ward Aff. ¶ 4D; C. Ward Aff., Ex. 7.)

On August 24, Sun Country offered the position of manager of operations on the ramp to Wilcox.  (Perry Decl. ¶ 7.)  It offered the position of General Manager for Servisair's MSP operations to a different candidate.  (Id. ¶ 8.)

On August 26, 2013, Wilcox gave Menzies notice of his resignation, effective September 27, 2013.  (Wilcox Aff. ¶ 32; Brown Aff., Ex. 8.)  He informed Menzies that he had obtained a job with Servisair.  (Wilcox Aff. ¶¶ 34.)  Also on August 26, Wilcox emailed himself additional information, including information about Menzies' physical assets at MSP, information about servicing Frontier Airlines, and Menzies' staffing plans.  (Harnden Aff., Ex. 9.)

Around the time of Wilcox's resignation, he had emptied everything from the Deleted Items folder in his Microsoft Outlook email program.  (Compl. ¶ 32.)  In examining the laptop formerly provided to Wilcox, Menzies has discovered additional encryption protections on the hard drive making it difficult to see which files were on the computer and what the computer had been used for.

(Compl. ¶ 34.)  It alleges, based "[o]n information and belief," that Wilcox put

the encryption on the laptop.  (Id.)

On August 29, Wilcox emailed Servisair to tell it about a business

opportunity with Sun Country in Phoenix.  (C. Ward Aff., Ex. 10.)  Throughout

the day, Wilcox continued to email Servisair questions about its plans and

requirements for the new MSP-Sun Country contract and he responded to a

Servisair email by saying, among other things, "Bag carts need to open on both

sides.  Single sided don't work well in this operation.  We had a shipment of

them and ended up sending them back." and "Only 10 belt loaders? Is that what

SCA wanted? I had twelve of each."  (C. Ward Aff., Ex. 11.)

On September 3, Wilcox wrote to Servisair to ask if it had developed a

checklist for the Sun Country contract.  (C. Ward Aff., Ex. 12.)  Wilcox offered to

develop a checklist if Servisair had not already done so.  (Id.)  A Menzies-Sun

Country checklist is one of the items that Wilcox had emailed to himself at one

point.  (Harnden ¶ 8.)

According to Wilcox, on September 4, Menzies told Wilcox that it was

terminating his employment and relieving him from any further duties.  (Wilcox

Aff. ¶ 35.)  According to Menzies, on that date, it placed Wilcox on "garden

leave," meaning that he was relieved of his duties but that he remained

employed, continued to receive his salary, and continued to owe a duty of

loyalty to Menzies until September 27.  (Brown Aff. ¶ 5.)  Up until September 4,

at Menzies' request, Wilcox had worked on transitioning Sun Country's business

from Menzies to Servisair.  (Wilcox Aff. ¶ 37.)  On September 4, Wilcox returned

all Menzies property.  (Id. ¶ 38.)  He showed Brown all of the emails that he had

sent to his personal email address, described the files that he had deleted from

his work laptop, explained that he usually deleted files that were no longer

needed, and stated that he had intended to clean up the laptop for the next

person who would use it.  (Id.)  He also told Brown that he had sent some emails

to his personal address to protect himself in case Menzies tried to hurt his

business reputation.  (Id.)  He did not ever place any encryption on his laptop

and does not even know what encryption is or how to do it.  (Id. ¶ 39.)

On September 5, 2013, Wilcox sent Servisair a list of the Menzies

employees who were servicing Sun Country at that time.  (C. Ward Aff., Ex. 13.)

Wilcox began working for Servisair on September 9.  (Perry Decl. ¶ 9;

Wilcox Aff. ¶ 41.)

Servisair avers that no one at the company knew that Wilcox had a

contract with Menzies that included any restrictive covenants until this lawsuit

was filed.  (R. Ward Decl. ¶ 11; Arble Decl. ¶ 6; Perry Decl. ¶ 12.)  Also, Servisair

does not employ restrictive covenants with its General Managers, and Wilcox

was not required to sign a non-competition agreement or confidential

information agreement as a condition of his employment with Servisair.  (Perry

Decl. ¶ 13.)

Currently, Wilcox acts as manager for ramp operations at MSP and

oversees the work necessary for Servisair to begin ground handling operations

for Sun Country on November 7, 2013.  (Arble Decl. ¶¶ 7, 11.)  He is obtaining

the necessary equipment, interviewing and hiring personnel who will perform

the actual ramp work, and establishing schedules.  (Id. ¶ 7.)  Once Sun Country

service starts, Wilcox will be responsible for ensuring safe and efficient ramp

operations.  (Id. ¶ 8.)  Servisair asserts that losing Wilcox would stop or slow this

key work until he could be replaced, which would likely be after the November 7

start date given the need for job notices, interviewing, background checks, drug

testing, airport security clearance, and a Customs Seal.  (Id. ¶¶ 10, 12-16.)  Thus,

loss of Wilcox would likely cause Servisair to breach its agreement with Sun

Country.  (Id. ¶ 17.)  The loss would also jeopardize ramp safety because

Servisair would not have an experienced ground handling manager at MSP.  (Id.

¶ 18.)

Wilcox avers that he never attempted to steer Sun Country's business from

Menzies to Servisair.  (Wilcox Aff. ¶ 40.)

### B.     Procedural History

Menzies drafted a Complaint in Hennepin County Court against Wilcox

and Servisair on September 23, 2013.  The Complaint alleges Count 1: Violation

of 18 U.S.C. § 1030(a)(4) Computer Fraud and Abuse Act – Wilcox; Count 2:

Breach of Contract – Wilcox; Count 3: Tortious Interference with an Agreement –

Servisair; Count 4: Breach of Duty of Loyalty – Wilcox; Count 5: Conversion –

Wilcox and Servisair; Count 6: Replevin – Wilcox and Servisair; Count 7:

Tortious Interference with Business Relationships and Expectancies – Wilcox and

Servisair; Count 8: Unjust Enrichment – Servisair; Count 9: Unfair Competition –

Servisair; and Count 10: Misappropriation of Trade Secrets and Confidential

Information, Minn. Stat. § 325C.01 et seq. – Wilcox and Servisair.

On October 1, 2013, Defendants removed the matter to this Court based on

federal question jurisdiction.  On October 3, Menzies filed the current Motion for

Temporary Restraining Order.

## III.    DISCUSSION

### A.    Preliminary Injunction Standard

The Eighth Circuit Court of Appeals has established the standard for

considering preliminary injunctions and temporary restraining orders.

Dataphase Sys. Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc ).

This Court must consider (1) the threat of irreparable harm to the moving party if

an injunction is not granted, (2) the harm suffered by the moving party if

injunctive relief is denied as compared to the effect on the non-moving party if

the relief is granted, (3) the public interest, and (4) the probability that the

moving party will succeed on the merits.  Id.

### B.    Probability of Success on the Merits

#### 1.    Count 10: Misappropriation of Trade Secrets (Wilcox and Servisair)

##### a)    Elements of a Misappropriation of Trade Secrets Claim

"Trade secret" means information, including a formula, pattern,
compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential,
from not being generally known to, and not being readily
ascertainable by proper means by, other persons who can
obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the
circumstances to maintain its secrecy.

18

> The existence of a trade secret is not negated merely because an
> employee or other person has acquired the trade secret without
> express or specific notice that it is a trade secret if, under all the
> circumstances, the employee or other person knows or has reason to
> know that the owner intends or expects the secrecy of the type of
> information comprising the trade secret to be maintained.

Minn. Stat. § 325C.01, subd. 5.

As relevant in this case, a defendant is liable for misappropriation of trade secrets if it acquires the trade secret of another and knows or has reason to know that the trade secret was acquired by improper means.  Minn. Stat. § 325C.01, subd. 3(i).  Alternatively, a defendant is liable for disclosing or using the trade secret of another without express or implied consent if the defendant used improper means to acquire the trade secret or, at the time of the disclosure, knew or had reason to know that 1) the trade secret derived from a person who had used improper means to acquire it; 2) the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or 3) the trade secret was derived from a person who owed a duty to maintain its secrecy or limit its use.  Id., subd. 3(ii).

"'Improper means' includes theft, bribery, misrepresentation, breach or

inducement of a breach of a duty to maintain secrecy, or espionage through

electronic or other means."  Minn. Stat. § 325C.01, subd. 2.

> **b)    Whether the Information at Issue Constitutes Trade Secrets**

First, the Court concludes that Menzies is not likely to demonstrate that

the information at issue is protectable as a true trade secret.  See Lasermaster

Corp. v. Sentinel Imaging, 931 F. Supp. 628, 637-38 (D. Minn. 1996).  Menzies has

failed to specifically identify the alleged trade secrets at issue.  Menzies merely

generalizes that information such as marketing information, internal reports,

employment matters and financial condition were confidential.  These cursory

descriptions do not meet Menzies' burden of providing that legitimate trade

secrets and confidential information are actually at stake.  See, e.g., Coyne's &

Co., Inc. v. Enesco, LLC, Civil No. 07–4095 (MJD/SRN), 2010 WL 3269977, at *16

(D. Minn. Aug. 16, 2010).  Moreover, Menzies has not shown that the allegedly

confidential information is not generally known.  See Universal Hospital Servs.,

Inc. v. Henderson, No. CIV.02–951(RHK/JMM), 2002 WL 1023147, at *4 (D. Minn.

May 20, 2002).  For example, generally known industry standards are not

protected trade secrets.  And Menzies has not addressed whether some of the

information that Wilcox has obtained regarding the best manner to service Sun

Country was gained when he worked at MSP as a General Manager for IASA.

Second, Menzies has failed to show that it took reasonable measures to

protect the information that it considers to be protected.  Menzies provided the

information at issue to Wilcox without informing him that it was confidential or

providing a policy designating the information as confidential.  Menzies knew

that Wilcox used his personal email and personal computer for work, which

included the allegedly confidential information, and Menzies, itself, used

Wilcox's personal email address for work matters.  Wilcox presents evidence that

much of the allegedly confidential information was regularly shared by Menzies

with Sun Country.  (See Wilcox Aff. ¶ 42; Wilcox Aff., Ex. 2.)

Third, Menzies has not shown that its claimed trade secrets have

independent economic value.  As Servisair points out, ground handling services

provided to Sun Country at MSP must be performed according to Sun Country's

policies and procedures, so it is not apparent how Menzies' own policies and

procedures are valuable to its competitor.  (Arble Aff. ¶ 9.)  Also, "mere

variations on widely used processes cannot be trade secrets."  Electro-Craft Corp.

v. Controlled Motion, Inc., 332 N.W.2d 890, 899 (Minn. 1983).

21

In its reply brief, Menzies asserts that the protected information includes

information that Menzies provided to Servisair regarding practices for handling

Sun Country and physical assets at MSP.  At this point, Menzies has not

demonstrated that is likely to be able to show that information that Wilcox

shared with Sun Country, such as whether bag carts for Sun Country flights need

to be open on both sides or whether Sun Country needs ten or twelve belt

loaders, is information that is not generally known or that is subject to reasonable

efforts to preserve confidentiality.

### c) Whether Wilcox Took Something that He Knew or Should Have Known Was a Trade Secret

Menzies' failure to show that the information and documents at issue are

protected trade secrets is sufficient to find that it is unlikely to succeed on this

claim.  The Court further points out that in order to succeed, Menzies will need

to show that Wilcox took something that he knew or should have known is a

trade secret.  Here, Menzies has not even identified the trade secrets, let alone

shown that Wilcox should have known that the information was protected.  An

employee is entitled to fair notice of the confidential nature of the material to be

kept confidential.  See Jostens, Inc. v. Nat'l Computer Sys., Inc., 318 N.W.2d 691,

702 (Minn. 1982).  As the Court has noted, Wilcox was not told which

22

information was confidential; no policy regarding designation of information as

confidential was provided to him; and Menzies ordered Wilcox to share

extensive information with Sun Country.

### d)      Whether Wilcox Conveyed the Alleged Trade Secrets to Servisair

Nor is there evidence that Wilcox shared any alleged trade secrets with

Servisair in connection with the Sun Country RFP.  The evidence currently in the

record shows that Sun Country was dissatisfied with Menzies' service and

decided, on its own, to ask Servisair to submit a bid.  Sun Country, itself, avers

that its decision to terminate Menzies was based on Menzies' performance, not

based on anything to do with Wilcox.

Overall, the Court concludes that Menzies is not likely to succeed on its

misappropriation of trade secrets claim.

### 2.      Count 2: Breach of the Non-Compete (Wilcox)

### a)      Choice of Law

The Non-Compete provides that Florida law applies.  However, the parties

disagree whether that choice-of-law provision should be given effect.

### (1)      Minnesota Choice of Law Standard

"Federal courts sitting in diversity apply the choice-of-law rules of the forum state." H & R Block Tax Services LLC v. Franklin, 691 F.3d 941, 943 (8th Cir. 2012) (citation omitted).  Generally, under Minnesota choice-of-law rules, "[b]efore a choice-of-law analysis can be applied, a court must determine that a conflict exists between the laws of two forums." Nodak Mut. Ins. Co. v. American Family Mut. Ins. Co., 604 N.W.2d 91, 93-94 (Minn. 2000) (footnotes omitted).  "A conflict exists if the choice of one forum's law over the other will determine the outcome of the case." Id. at 94.  The Court must next analyze whether each state's law can be constitutionally applied.  Nodak Mut. Ins. Co., 604 N.W.2d at 94 n.2.  If there is an actual conflict and both states' laws can be constitutionally applied, then, generally Court then applies the significant contacts test.  Id.

Under Minnesota law, generally, contracting parties can choose the law to govern their contract, so long as the parties are acting in good faith and without intent to evade the law.  See Combined Ins. Co. of Am. v. Bode, 77 N.W.2d 533, 536 (Minn. 1956), cited in Milliken & Co. v. Eagle Packaging Co., 295 N.W.2d 377, 380 n.1 (Minn. 1980); Hagstrom v. American Circuit Breaker Corp., 518 N.W.2d 46, 48 (Minn. Ct. App. 1994).

(2)     **Conflict Between Florida and Minnesota Law**

Florida and Minnesota law conflict in multiple significant ways.  For

example, Florida recognizes continued employment alone as sufficient

consideration to enforce a non-compete.  See Open Magnetic Imaging, Inc. v.

Nieves-Garcia, 826 So.2d 415, 417 (Fla. Ct. App. 2002).  Minnesota does not.  See

Sanborn Mfg. v. Currie, 500 N.W.2d 161, 164 (Minn. Ct. App. 1993).

(3)     **Analysis**

Despite Minnesota's general rule enforcing parties' choice of law

provisions in contracts, the Court concludes that this is likely to be one of the rare

cases in which the choice of law provision does not govern.

First, the Court is doubtful whether application of Florida law is

constitutional.  Cf. Medtronic, Inc. v. Gibbons, 684 F.2d 565, 568 (8th Cir. 1982)

(upholding choice of law provision in employment contract when the court

"see[s] no federal constitutional obstacle to the choice of Minnesota law; here,

Minnesota clearly has the requisite significant contact or significant aggregation

of contacts, creating state interests, such that choice of its law is neither arbitrary

nor fundamentally unfair).  Here, the record demonstrates no connection to

Florida.  Wilcox lives in Minnesota, received the Non-Compete while working

25

for Menzies at a Minnesota airport, signed the contract in Minnesota, and

performed his job duties in Minnesota.  (Wilcox Aff. ¶¶ 4, 6-8.)  Menzies is

incorporated in Delaware and has its principal place of business in Texas.

(Compl. ¶ 4.)  In its briefs, Menzies makes no argument that Florida has any

connection to the parties or case before the Court.  At oral argument, Menzies

pointed out that Redmond's verification of the Verified Complaint was signed in

Florida.  Counsel then proceeded to argue that Redmond runs Menzies from

Florida.  There is no evidence in the record to support this argument, and the

Court will not speculate on a connection to Florida based solely on the fact that

Redmond signed the verification in Florida.

Second, the utter lack of any connection to Florida combined with the

circumstances surrounding Wilcox's signing the Non-Compete – he was ordered

to "immediately" sign the Non-Compete, which was presented in a large stack of

documents with no explanation, after he had already accepted the Menzies job

and had begun working – indicate that Menzies did not act in good faith in

creating the Florida choice of law provision.

Third, Minnesota would likely not enforce a choice of law provision in a

contract of adhesion – a "'take it or leave it' form contract between parties of

unequal bargaining power." <u>Cell v. Moore & Schley Sec. Corp.</u>, 449 N.W.2d 144,

147 (Minn. 1989).  Here, after already starting work for Menzies, Wilcox was

ordered to sign and return a stack of documents, including the Non-Compete.

The parties were in greatly unequal bargaining positions.  Menzies is a

sophisticated business that had just taken over Wilcox's former employer, and

Wilcox was an individual, already working for Menzies, with no experience with

non-compete agreements, ordered by his employer to immediately sign a large

stack of documents.

### (4)    Analysis under Minnesota's Significant Contacts Test

Having concluded that the choice of law provision is likely unenforceable,

the Court then addresses Minnesota's significant contacts test for its choice of

law analysis.  The Court must address the following factors:

(1) Predictability of results;

(2) Maintenance of interstate and international order;

(3) Simplification of the judicial task;

(4) Advancement of the forum's governmental interest; and

(5) Application of the better rule of law.

<u>Nodak Mut. Ins. Co.</u>, 604 N.W.2d at 94 (citation omitted).

Here, the factors clearly weigh in favor of Minnesota law.  Normally, under the first factor, a contractual choice-of-law provision weighs in favor of choosing the law designated.  Here, the Court has concluded that the choice of law provision is likely unenforceable, and the records demonstrates no connection between Florida law and the Non-Compete or the parties such that the parties would expect Florida law to apply.  Instead, the application of Minnesota law furthers predictability: the Non-Compete was executed in Minnesota, by a Minnesota resident, regarding a job in Minnesota, and addressed activities in Minnesota.  Applying Minnesota law will not inhibit commerce or disrespect Florida law because there are no Florida contacts with this case.  Minnesota's governmental interest is promoted by using Minnesota law for a Minnesota transaction and by carefully scrutinizing the Non-Compete.

### b)      Execution of the Non-Compete

Under Minnesota law, continued employment alone is insufficient consideration to support enforcement of a non-compete agreement against an already employed employee.  See, e.g., Sanborn Mfg., 500 N.W.2d at 164.  Here, Menzies presented the Non-Compete to Wilcox after he had already begun his employment with Menzies, without explanation, and required him to sign and

return it immediately.  Because he had already started his employment, Wilcox

received no new benefits under the Non-Compete.  He received no promotion,

special training, or other benefit in return for signing the Non-Compete.  Thus, it

is likely that the Non-Compete is not enforceable.  See, e.g., Davies & Davies

Agency, Inc. v. Davies, 298 N.W.2d 127, 133 (Minn. 1980).

The Court further notes that it is unlikely that Wilcox exerts the type of

personal influence over Menzies' customers or potential customers sufficient to

justify a restraint on his work in his field.  Menzies has offered no such evidence.

Sun Country switched ground handlers because of Menzies' performance.  Sun

Country avers that Wilcox did not factor into its decision in any manner.  Nor is

there evidence that Spirit Airlines or Frontier Airlines would be likely to leave

Menzies because Wilcox has joined Servisair.  Additionally, as discussed with

regards to the misappropriation of trade secrets claim, Menzies has failed to

identify protected information that could serve as a legitimate business interest

to support the covenants.  Under either Minnesota or Florida law, Menzies'

failure to identify a legitimate business interest to justify the restrictive covenant

likely defeats its case.  See, e.g., Passalacqua v. Naviant, Inc., 844 So.2d 792, 795-

97 (Fla. Ct. App. 2003).

29

### 3.     Count 1: Computer Fraud and Abuse Act (Wilcox)

The Computer Fraud and Abuse Act "provides that one who suffers 'damage or loss' because of a violation of the Act may bring a civil action for compensatory damages and injunctive relief." Mclean v. Mortgage One & Finance Corp., No. Civ.04–1158(PAM/JSM), 2004 WL 898440, at *2 (D. Minn. Apr. 9, 2004).  A civil action may be brought by a person who suffers damage or loss of at least $5,000 by reason of a person's violation of the act by knowingly and with intent to defraud, accessing protected computers without authorization or in excess of his authorization and obtaining something of value of more than $5,000 in any 1-year period.  18 U.S.C. § 1030(a)(4); (c)(4)(A)(i), (g).

Menzies claims that Wilcox intentionally accessed Menzies' protected computer database and sent himself large amounts of confidential data in order to allow Servisair to unfairly compete with Menzies.  The Court holds that, based on the record before it, assuming without deciding that Wilcox did engage in unauthorized access, Menzies is unlikely to be able to show that Wilcox caused any damages, let alone $5,000 in damages.  The evidence in the record is that Sun Country switched from Menzies to Servisair based on reasons wholly unrelated to Wilcox and any information he may or may not have forwarded to himself.

4.      **Count 3: Tortious Interference with an Existing Contract (Servisair)**

A cause of action for wrongful interference with a contractual relationship requires: "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." Kjesbo v. Ricks, 517 N.W.2d 585, 588 (Minn. 1994) (citation omitted).

a)      **Interference with the Non-Compete**

First, the evidence in the record shows that Servisair was not aware of the Non-Compete until it was served with this Complaint. Thus, Menzies cannot establish the second element – that Servisair had knowledge of the contract between Menzies and Wilcox. Second, Menzies is unlikely to establish that the Non-Compete was breached because, as explained with regard to Count 2, the Court holds that it is likely that the Non-Compete is not enforceable.

b)      **Interference with Relationship Between Menzies and Sun Country**

As for the relationship between Menzies and Sun Country, Menzies has not shown that Servisair used trade secrets – or any other kind of illegal competition – to unfairly compete and take the Sun Country account.

Additionally, Menzies likely cannot show damages because the evidence from

Sun Country and throughout the record shows that Sun Country changed from

Menzies to Servisair for reasons unrelated to Wilcox or any alleged trade secrets.

### 5.   Count 4: Breach of the Duty of Loyalty (Wilcox)

> An employee's duty of loyalty prohibits her from soliciting
> the employer's customers for herself, or from otherwise competing
> with her employer, while she is employed.  Employees who wish to
> change jobs or start their own businesses, however, should not be
> unduly hindered from doing so.  An employee has the right,
> therefore, while still employed, to prepare to enter into competition
> with her employer.

Rehabilitation Specialists, Inc. v. Koering, 404 N.W.2d 301, 304 (Minn. Ct. App.

1987) (citations omitted).

The Court holds that the record does not show that Menzies is likely to

succeed on this claim.  The law permitted Wilcox to prepare to compete while he

was still employed by Menzies.  There is conflicting evidence regarding when his

employment with Menzies ended.  At this point, the Court finds Wilcox's claim

that his employment ended on September 4 to be more credible.  Also, Sun

Country had directed Menzies to smoothly transition the account to Servisair,

and Wilcox avers that Menzies directed him to do so.  Therefore, many of his

actions before September 4 can be attributed to fulfilling his duty to Menzies to

transition the Sun Country account.  Furthermore, Menzies had threatened to fire

Wilcox if it lost the Sun Country account and told him to go work for Servisair,

which undercuts a claim that Wilcox violated a duty of loyalty by doing just that.

### 6.    Count 5: Conversion (Wilcox and Servisair)

"Conversion is the exercise of dominion and control over goods

inconsistent with, and in repudiation of, the owner's rights in those goods.  To

state a cause of action for conversion, a plaintiff must establish: (1) ownership of

the goods or a right to the goods; and (2) that the defendant's actions were

inconsistent with that right."  Impulse Trading, Inc. v. Norwest Bank Minn.,

N.A., 870 F. Supp. 954, 958 (D. Minn. 1994) (citations omitted).

The Court concludes that Menzies is unlikely to succeed on its claim.  As

explained with regard to the misappropriation of trade secrets claim, it is likely

that Wilcox did not take or use Menzies' trade secrets or confidential

information.  Nor is there any evidence that Servisair obtained or used any such

information from Wilcox.  Additionally, given the evidence regarding Sun

Country's decision to contract with Servisair over Menzies, Menzies likely cannot

show injury caused by either Wilcox's or Servisair's actions.

### 7.     Count 8: Unjust Enrichment (Servisair)

"A claim for unjust enrichment arises when a party gains a benefit illegally

or unlawfully," and the rights of the parties are not governed by a valid contract.

Midwest Sports Marketing, Inc. v. Hillerich & Bradsby of Canada, 552 N.W.2d

254, 268 (Minn. Ct. App. 1996).

Menzies argues that, by hiring Wilcox, Servisair wrongfully used his illicit

information to bolster its ground handling services at MSP.  As previously

discussed, Menzies cannot show an injury proximately caused by Servisair's

conduct.  Nor can it show that any trade secret or confidential information was

obtained by Servisair.

### 8.     Count 9: Unfair Competition (Servisair)

"[U]nder Minnesota law, [u]nfair competition is not a tort with specific

elements, but rather, it describes a general category of torts which courts

recognize for the protection of commercial interests."  Lenscrafters, Inc. v. Vision

World, Inc., 943 F. Supp. 1481, 1490 (D. Minn. 1996) (citation omitted). "[A]

common law unfair competition claim must identify the underlying tort which is

the basis for [the claim].  Moreover, if the underlying tort is duplicative of

another Count of the Complaint, the claim for unfair competition cannot stand."

Id. (citation omitted).  "An employee's breach of his duty of loyalty may

constitute unfair competition."  Rehabilitation Specialists, Inc., 404 N.W.2d at

306.

Menzies argues that Wilcox stole confidential information and gave it to

Servisair, which would not have been able to build a successful ground handling

operation at MSP without that information.  It claims that Wilcox breached his

duty of loyalty and his Non-Compete, and Servisair has engaged in unfair

competition by benefiting from those violations.

Court finds that Menzies is unlikely to succeed on this claim because there

is no evidence that Servisair obtained or used confidential Menzies information.

Nor is it likely that Menzies can show any injury proximately caused by

Servisair's conduct.

## C.    Threat of Irreparable Harm

The Court holds that Menzies has failed to show a threat of irreparable

harm.  Menzies already lost the Sun Country contract to Servisair, and the

requested injunction will not undo that transaction.  There is no evidence that

Servisair will be using confidential Menzies information to perform on the Sun

Country account.  There is no evidence that Wilcox will harm Servisair by

working for Servisair and servicing that already lost Sun Country account.

35

Moreover, if Wilcox and Servisair are eventually found liable to Menzies, monetary damages would suffice.  See Packard Elevator v. ICC, 782 F.2d 112, 115 (8th Cir. 1986) (noting that "economic loss does not, in and of itself, constitute irreparable harm").

### D.   Balance of the Harms

The balance of the harms weighs against an injunction.  If the injunction issues, Wilcox will be barred from working in the industry that he has worked in for decades unless he moves to be close to another major airport.  He owns a home here and his family is here.  There is no other large airport in commuting distance.  Also, if the injunction issues, Servisair faces the likely proposition of breaching the Sun Country contract and suffering a loss of reputation and good will.  In contrast, Menzies already suffered the harm that it fears – losing the Sun Country contract.  There is no evidence that, by working for Servisair, Wilcox might induce Spirit Airlines or Frontier Airlines to leave Menzies.  Thus, Menzies does not appear to face a solid harm in the absence of an injunction.

### E.   Public Interest

While the public interest does favor protecting confidential information and enforcing contracts, it also favors competition.  Here, Menzies is unlikely to succeed on claims based on its alleged trade secrets, and the Non-Compete is

36

likely unenforceable.  Sun Country has chosen its new ground handler and the

public interest favors allowing free competition by allowing Servisair to fulfill

that contract.  Given the serious questions about the enforceability of the Non-

Compete and the existence of true trade secrets, the public interest weighs

against barring an individual from earning a living in his home state.

For the foregoing reasons, the Court denied Plaintiff's Motion for a

Temporary Restraining Order in the Order dated October 17, 2013.


Dated:   October 17, 2013          s/ Michael J. Davis
                                   Michael J. Davis
                                   Chief Judge
                                   United States District Court